UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COLLEEN T. GOLDBERG,

     Plaintiff,

v.                                     CASE NO. 8:11-cv-1659-T-23MAP

COMPANION LIFE INSURANCE
COMPANY,

     Defendant.

_____/

## **ORDER**

An insurance policy in an ERISA employee welfare benefit plan promises to pay the insured, whose "annual salary" was $260,000, a life insurance benefit in "an amount equal to 3 times Your Annual Salary, up to $400,000." After the insured's death in an airplane crash, the insurer paid the beneficiary $400,000, the stated "up to" amount. The beneficiary appealed and demanded $780,000, three times the deceased's annual salary. The insurer rejected the beneficiary's claim on appeal. The beneficiary sued under ERISA for the death benefit of $780,000. Each party moves for summary judgment and contends persuasively that no genuine issue of material fact exists and that one party is entitled to judgment as a matter of law.

## **DISCUSSION**

### 1. Modifiers and Referents

Discussing the need for "clear referents" and discussing "miscues" that result from "misplaced modifiers," the leading authority on modern American usage in

general and modern American legal usage in particular states, "When a word such as a pronoun points back to an antecedent or some other referent, the true referent should generally be the closest appropriate word." Bryan A. Garner, *Garner's Modern American Usage* 540 (Oxford 2009). *Garner's* advises that "[w]hen modifying words are separated from the words they modify, readers have a hard time processing the information. Indeed, they are likely to attach the modifying language first to a nearby word or phrase." *Garner's* at 540. *Garner's* illustrates the problem of the misplaced modifier with several examples, including this one: "Both died in an apartment Dr. Kivorkian was leasing after inhaling carbon monoxide." (Read: "After inhaling carbon monoxide, both died in an apartment Dr. Kivorkian was leasing.") *Garner's* at 540. Confirming that the problem of the misplaced modifier similarly plagues a relative pronoun that begins a phrase that is remote from the intended antecedent, *Garner's* advises that "[t]he best practice is simply to ensure that the relative pronoun immediately follows the noun it modifies." *Garner's* at 708. *Garner's* offers this example: "Justice Blackmun . . . wanted to reopen a dialogue on the death penalty that had all but disappeared from the Court . . . ." (Read: "Justice Blackmun . . . wanted to reopen a death penalty dialogue that had all but disappeared from the Court . . . ." ) *Garner's* at 708.

The effect of properly (or improperly) placing a modifier is palpable, and examples of misplacement are legion, sometimes humorous but sometimes

disastrous.  *See* Jacques Barzun*, Simple & Direct:  A Rhetoric for Writers* 56-65 (Harper & Row 1985) ("The congressman sat informally on the carpet and discussed food prices and the cost of living with several women."  [Read:  "The congressman sat informally on the carpet and discussed with several women food prices and the cost of living."]); William Strunk, E.B. White & Maria Kalman, *The Elements of Style* 44-49 (The Penguin Press 2005) ("You can call your mother in London and tell her about George's taking you out to dinner for just two dollars."  [Read:  "For just two dollars, you can call your mother in London and tell her about George's taking you out to dinner."]); Theodore M. Bernstein, *The Careful Writer:  A Modern Guide to English Usage* 281-82 (Atheneum 1985) ("The new facilities will make it possible for babies to be born in Roosevelt Hospital for the first time."  [Read:  "The new facilities will make it possible for the first time for babies to be born in Roosevelt Hospital."]); Richard M. Weaver, *A Rhetoric and Composition Handbook* 174-79 (Quill 1967) ("Merchandise was sold by the company that had been damaged by the fire."  [Read:  "Merchandise that had been damaged by the fire was sold by the company."]).

Often the intended meaning of a mangled sentence becomes clear because of the manifest sense (or nonsense) of the sentence read one way or the other, because of the context of the sentence, or because of the reader's knowledge of the sentence's subject independent of the sentence's content.  But sometimes the intended meaning

remains obscure.  For example, consider the statement, "He spoke of death in a gruesome manner."  Two possible meanings contend:  "He spoke in a gruesome manner of death" and "He spoke of death in a gruesome manner."  Owing to the forceful influence of proximity, the sentence undoubtedly and undeniably means the latter:  "He spoke of death in a gruesome manner," meaning the manner of dying, not the manner of speaking, was gruesome.  Or consider:  "The President received a demand to support the recognition of Palestine by twenty foreign governments."  Did the president receive one demand about twenty nations' support for the recognition of Palestine or did the president receive twenty demands about one nation's (the United States') support for the recognition of Palestine?  As these last few examples attest, ambiguity arises most forcefully and vexingly when each alternative referent for a modifier results in an equally plausible reading of a sentence.  For example: "The dog bit the child, not the cat."

The proximity of a modifier to a word or phrase is the primary determinant of meaning.  Joining *Garner's* and the unanimous authorities, Bernstein advises, "There is no rule about the placement of modifying phrases except perhaps the very general one that they should be as close as possible to the things they modify."

The misplaced modifier and the force of proximity in determining meaning present a problem not only in everyday English, but – often more consequentially – in the law.  The need for proximity between modifier and antecedent is recognized in the interpretation of statutes.  2A Norman J. Singer & J.D. Shambie Singer,

*Sutherland on Statutes and Statutory Construction* § 47:33 at 487-88 (Thomson West

2007) ("Referential and qualifying words and phrases, where no contrary intention

appears, refer solely to the last antecedent . . . 'the last word, phrase, or clause that

can be made an antecedent without impairing the meaning of the sentence.'");

Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts*

152-53 (Thomson West 2012) ("Nearest Reasonable Referent Canon:  When the

syntax involves something other than a parallel series of nouns or verbs, a prepositive

or postpositive modifier normally applies only to the nearest reasonable referent.")

   *Reading Law* cites, as an example of the "nearest reasonable referent canon,"

*Carroll v. Sanders*, 551 F. 3d 397 (6th Cir. 2008), which decides whether a provision in

the Bankruptcy Code bars a second discharge of debt for four years after filing an

earlier petition or for four years after a receiving an earlier discharge of debt.  The

statute provides that a debtor may not receive a discharge if the debtor "received a

discharge . . . in a case filed under chapter 7 . . . of this title during the 4-year period

preceding" the filing of the debtor's present chapter 13 petition.  In other words, does

the phrase "during the 4-year period preceding" refer to the remote term "received a

discharge" or to the more proximate term "filed under chapter 7"?  The Sixth Circuit

followed the "nearest reasonable referent" rule, applied the four-year bar to the

earlier filing, and held:

> As we see it, the four-year prohibition began when Sanders filed his
> first petition, not when he received his first discharge.  In reaching this
> conclusion, we start with a point of grammar – that "[w]hen a word

> such as a pronoun points back to an antecedent or some other referent, the true referent should generally be the closest appropriate word." Bryan A. Garner, *Garner's Modern American Usage* 523-24 (2003); *see also* 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:33 (7th ed. 2007).  Consistent with this principle, the courts ordinarily assume that "a limiting clause or phrase . . . modif[ies] only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Although not an "absolute" imperative, the "rule of the last antecedent" creates at least a rough presumption that such qualifying phrases attach only to the nearest available target.

551 F.3d at 399.

The role of proximity in grammatical modifying and the "rule of the last antecedent" are recognized, as well, in the interpretation of an insurance policy. 2 Steven Plitt, Daniel Maldonado & Joshua Rogers, *Couch on Insurance 3d* § 22:5 at 22-16 (West Group 2010).  Using words similar to the authorities in other disciplines and other areas of the law, *Couch* adds that "reasonable intent governs, regardless of strict rules of grammatical accuracy in the language used, or of punctuation."  (The allusion to a "strict" rule is a slyly planted pejorative; this dissent from applying the "strict" rule evokes the image of a baseball player, called "out" on a third strike, who denies to his adoring fans that he "struck out" and insists that he is a blameless victim of the umpire's "strict" application of the rules of baseball.)

The parties' summary judgment motions present the issue whether the phrase "an amount equal to 3 times Your Annual Salary, up to $400,000" actually means, as the insurer contends, "an amount, up to $400,000, equal to 3 times Your Annual Salary."  A "rough presumption" exists that the phrase "up to $400,000" modifies the

nearest and most proximate and reasonable referent, which is "Your Annual Salary" and not the remote "an amount."  The insurer dismissively claims (1) that the beneficiary's proposed interpretation of the policy language "is baseless, based on a straightforward reading of the policy language" and (2) that, "applying standard rules of construing the English language," the insurer's interpretation "is the only correct one."  (The "standard rules of construing the English language" to which the insurer alludes remain unspecified, even after inquiry during oral argument.)  However, a "straightforward reading" that reveals the "plain meaning" of the policy fully accords with the "rough presumption" and with the powerful influence of proximity on modifiers.  The question remains whether other indicators of meaning, besides the words of the disputed phrase, overcome the plain and presumptive meaning of the phrase.  Each party suggests some indicators; some pull one way and some pull the other.

### 2. More Interpretive Aids

The insurer's monthly billing notice (Doc. 22-1 at 48) to the employer beginning with the initial bill in March, 2008, and continuing through August, 2008, identifies the deceased as a "participant" entitled to a $400,000 life insurance benefit. Additionally, the billing notice displays that $26.00 of the monthly billing is attributable to the $400,000 coverage for the deceased.  A simple and obvious multiplication confirms that the contractual rate of $0.065 for each $1000 in coverage (Doc. 22-1 at 11) yields a billing of $26.00 for $400,000 in coverage.  A review of

each insured listed in the insurer's monthly billing statement to the employer confirms that $400,000 was the maximum life insurance benefit for which the insurer charged a premium.  Undoubtedly, the conspicuous and simple billing formula and the schedule of benefits showing a maximum benefit of $400,000 among the covered employees strongly suggest that the insurer and the employer each understood that the coverage purchased was an amount of coverage "up to" $400,000.  After August, 2008, the employer assumed responsibility for the computation of the aggregate monthly premium, and the employer's computation of the premium confirms that the employer, like the insurer, assumed an "up to" amount of $400,000 in life insurance coverage for each employee, even if "3 times Your Annual Salary" was a greater amount.[1]

The deceased was killed in an airplane crash in February, 2009. Consequently, the employer prepared, and both the employer – through the employer's "H.R. Director" – and the beneficiary signed, a statement (Doc. 22-1 at 88) certifying to the insurer the salary of the deceased and stating:

> We hereby certify that to the best of our knowledge and belief, the above statements are correct and that said deceased's Insurance was in force of the date or his or her death for the amount of $ 400,000 LIFE/$400,000 AD&D.

---

[1] When purchasing the insurance policies, the employer requested that the benefits equal the benefits available under the predecessor policy, offered by another company.  The predecessor policy provided a life insurance benefit of "Three (3) times Earnings, rounded to the next higher $1,000, subject to a maximum of $400,000."  The beneficiary insists that this fact is outside the administrative record and inadmissible.  Although otherwise probative and admissible (and helpful to the insurer), this fact plays no part in the district court's review of the denial of benefits.

The phrase "$400,000 LIFE/$400,000 AD&D" is handwritten on the statement.  As suggested by the insurer, the statement from the employer and the beneficiary expressing knowledge of, and belief in, the existence of coverage of $400,000 is highly probative of the prevailing understanding among the parties affected by the policy.  The policy provides that "[i]n making any decision, [the insurer] may rely on the accuracy and completeness of any information furnished by the policyholder." (Doc. 22-1 at 7)  Again, the employer and the beneficiary's statement evidences the parties' understanding that the available coverage was "up to" $400,000 regardless of the deceased's salary.

The beneficiary cites the "Living Benefits Option" (Doc. 22 at 26), which provides – for an insured with either a "terminal condition" expected to result in death within six months or an illness or injury with no reasonable prospect of recovery – a lump sum benefit equal to "80% of the amount of life insurance in force on Your life, but not to exceed $500,000."  The beneficiary, consistent with the beneficiary's interpretation of the clause centrally disputed in this action, interprets "$500,000" to modify the proximate term "life insurance," but the insurer, consistent with the insurer's interpretation of the clause centrally disputed in this action, interprets "$500,000" to modify the remote "80%."  Accordingly, the beneficiary argues (Doc. 23 at 5) that, unless the words of the Living Benefits Option are meaningless, which is a disfavored interpretive result, the provision's mentioning

$500,000 in life insurance evidences that the beneficiary's coverage exceeds the "up to" amount of $400,000.

The beneficiary's argument neglects the fact that the insurer employs a "form" insurance policy that is selectively modified to suit an individual circumstance. This general purpose clause, applicable to every policy regardless of the amount of the particular life insurance benefit payable to a particular insured, fixes a generic maximum on the benefit but carries no interpretive force with respect to the deceased's actual death benefit in this case. In any event, because both the insurer's and the beneficiary's interpretation of the Living Benefits Option adheres in form to their respective interpretation of the death benefit at issue in this case, the parties' dispute about the Living Benefits Options merely re-states indecisively and in different terms each party's argument about the clause centrally disputed in this action. In other words, the Living Benefits Option is evidence of the problem, not the solution.[2]

---

[2] The policy contains other provisions in the same grammatical form as the provision in the Living Benefits Option and the provision principally at issue in this case. For example, in the "Features" section under "Living Benefits Option for You" (Doc. 23-2 at 23) the policy describes the benefit as "50% of the amount of the Life Insurance Benefit . . . if You incur a Terminal Condition, but not to exceed $100,000." At least twice (once for the "Airbag Benefit" and again for the "Seat Belt Benefits") in the "AD&D Benefit Schedule" under "Other Benefits" (Doc. 23-2 at 26) the policy describes the benefit as "10% of the Principal Sum, up to $50,000." In each of these examples, the policy employs the now-familiar grammatical form "one amount derived from another amount, not to exceed X." Despite the interpretive value of the meaning of each clause, neither party mentions any of the clauses, and nothing about their interpretation and application appears in the administrative record, including in the insurer's sparse explanation of the denial of the beneficiary's appeal.

### 3. The Denial and the Standard of Review

As stated earlier, soon after the insured was killed in an airplane crash in February, 2009, the employer prepared and both the employer – through the employer's "H.R. Director" – and the beneficiary signed a statement (Doc. 22-1 at 88) certifying to the insurer the salary of the deceased and stating:

> We hereby certify that to the best of our knowledge and belief, the above statements are correct and that said deceased's Insurance was in force of the date or his or her death for the amount of $ ~~400,000 LIFE/$400,000 AD&D~~.

The insurer paid the beneficiary, who is the insured's widow and the plaintiff in this action, $400,000 plus accumulated interest.  By a letter six days later from the beneficiary's lawyer, the beneficiary demanded $780,000, which the record suggests is the first mention of $780,000 by either party or anyone else in the history of the coverage.  About two weeks later, July 30, 2009, the insurer responded:

> The Schedule of Benefits does read the Amount of Life Insurance is an amount equal to 3 times your annual salary, however the life insurance maximum as described in the schedule is $400,000.  The limit does not apply to an employee's amount of salary, but to the life insurance benefit amount.

> This is the amount of coverage in force at the time of his death.  There would be no additional benefit due.[3]

---

[3] ERISA requires at 29 U.S.C. § 1133 that "every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  The beneficiary raises no question of the sufficiency of the insurer's notice of denial and the effect, if any, on the standard of review applicable in the district court.  *See Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621 (7th Cir. 2005); *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 128-132 (1st Cir. 2004); *Skretvedt v. E.I. DuPont de*

(continued...)

On October 27, 2009, again through her lawyer, the beneficiary demanded $780,000.

The insurer responded on November 17 and questioned whether the beneficiary's

October 27 letter was an appeal from the earlier determination that the insurer owed

only $400,000.  By a letter three days later, the beneficiary confirmed that the earlier

letter was an appeal.

On February 16, 2010, the insurer sent to the beneficiary a denial of the appeal

and explained:

> Regarding your appeal for additional life insurance benefits, the
> maximum life insurance benefit under the policy is an amount equal to
> 3 times an employee's annual salary, up to $400,000.  The Living
> Benefits Option that you referenced in your appeal letter did not apply
> in Mr. Goldberg's case, and it also limits the maximum benefit payable
> under the living benefit provision to a maximum benefit of $400,000.
>
> In summary, maximum benefits were previously paid under the policy.
> As a result, we are unable to overturn our previous decision, and no
> additional benefits are due.

The insurer's denial of the beneficiary's claim receives deference under the

"arbitrary and capricious" standard of review and is affirmed if reasonable.[4]  If, as in

---

[3] (...continued)
*Nemours and Co.*, 268 F.3d 167, 178 n. 8 (3d Cir. 2001); James F. Jorden, Waldemar J. Pflespsen, Jr. & Stephen H. Goldberg, *Handbook on ERISA Litigation: Third Edition* § 503(D) (Walters Kluwer 2012 Supplement).

[4] The standard of review is established solidly after a series of controlling decisions. *Conkright v. Frommert*, 130 S. Ct. 1640 (2010); *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *Doyle v. Liberty Life Assur. of Boston*, 542 F.3d 1352 (11th Cir. 2008); *Tippitt v. Reliance Northwestern Mut. Life Ins. Co.*, 457 F.3d 1227 (11th Cir. 2006); *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137 (11th Cir. 1989); James F. Jorden, Waldemar J. Pflespsen, Jr. & Stephen H. Goldberg, *Handbook on ERISA Litigation – Third Edition* § 504(C) (Wolters Kluwer 2012 Supplement); Paul J. Schneider & Brian M. Pinheiro, *ERISA: A Comprehensive Guide – Third Edition* §§8.03(G)–(J) (Wolters Kluwer 2008).

this action, the insurer acts as the plan fiduciary and a conflict of interest accompanies the insurer's determination, the conflict of interest is a factor weighed in considering whether a fiduciary's determination was arbitrary and capricious.

A useful summary of the application of the governing standard of review appears in *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195-96 (11th Cir. 2010):

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

As observed in *Colardo v. Metropolitan Life Ins. Co.*, 2011 WL 1899253 *6 (M.D. Fla. 2012), and acknowledged in *Capone*, "the heightened arbitrary and capricious review called for at step six was implicitly overruled in [*Glenn*]." The heightened arbitrary and capricious review mentioned in step six was explicitly overruled in *Doyle*. After *Glenn*, *Doyle*, and *Capone* step six becomes:

- 13 -

> (6) If there is a conflict of interest, consider whether the insurer's
> decision is arbitrary and capricious after weighing the conflict of
> interest as an additional factor against the affirming the decision.

Applying the *de novo* standard of review and deciding whether the insurer's determination is right or wrong presents a close question. The policy's plain words ("an amount equal to 3 times Your Annual Salary, up to $400,000"), which offer the primary or initial indicator of meaning, express a limit on the more proximate phrase "annual salary," as contended by the beneficiary, and not on the more remote phrase "an amount," as contended by the insurer.

However, the billing statements from the insurer to the employer include both (1) the conspicuous display of a designation of the deceased by name as an insured with $400,000 in life insurance coverage and (2) a conspicuous computation of the premium based on $400,000 ($0.065 per $1000 in coverage times 400) in life insurance coverage. These two factors, considered together, present persuasive evidence that the insurer and the employer understood that the policy granted $400,000 in coverage to the insured (and some other employees) and that the employer paid for $400,000 in coverage.

Similarly, after the fatal airplane crash, the mutual statement from the employer and the beneficiary requested a death benefit for the deceased of $400,000, which also evinces that the insurer and the employer shared an understanding of the meaning of the policy provision at issue.

In sum, the policy and other pertinent matters present a basis on which the insurer could – with reason – have decided the coverage question either way. The phrase in question, interpreted in accord with its words, means what the beneficiary claims. The phrase, read in accord with the economics of the transaction and the exchanges between the insurer and the employee before the beneficiary's death, means what the insurer claims. I would have decided *de novo* that the misplaced modifier is a common and innocent inadvertence among speakers of English and that the policy, the bills, the demand for payment, and other matters discussed suggest that the insurer decided the coverage question, on balance, correctly and in accord with the understanding and intent, as well as the agreed economics, of the agreement.

However, even if the insurer decided incorrectly, the insurer in this instance enjoyed discretion to resolve issues of coverage and policy interpretation, and enough evidence gravitates in support of the insurer's determination to satisfy easily the deferential "arbitrary and capricious" standard.

In this instance, the insurer operated under a conflict of interest. Adding that factor against the insurer and in favor of the beneficiary results in no change. The record reveals no evidence sufficient to show that financial self-interest or other impediments marred the insurer's decision or that the conflict of interest is any sharper or any more intrusive than is inherently present.

## CONCLUSION

Because the record presents no genuine issue of material fact and because the defendant is entitled to judgment as a matter of law, the defendant's summary judgment motion is **GRANTED**, the plaintiff's summary judgment motion is **DENIED**, and the insurer's denial of the disputed claim is **AFFIRMED**.  The clerk shall enter a judgment for the defendant and against the plaintiff and **CLOSE** the case.

ORDERED in Tampa, Florida, on December 19, 2012.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE